Filed 7/26/13  In re D.S. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re D.S., et al., Persons Coming Under the Juvenile Court Law. | |
| TULARE COUNTY HEALTH AND HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> L.K., <br><br> Defendant and Appellant. | F066146 <br><br> (Super. Ct. Nos. JJV063751A & JJV063751B) <br><br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Juliet L. Boccone, Judge.

Catherine C. Czar, under appointment by the Court of Appeal, for Defendant and Appellant.

Kathleen Bales-Lange, County Counsel, John A. Rozum and Jason Chu, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

L.K. (mother) appeals juvenile court orders summarily denying her petition for modification under Welfare and Institutions Code[1] section 388, and terminating her parental rights to her daughter, Rebecca S., and establishing a legal guardianship for her daughter, D.S., under section 366.26.  Mother contends the court erred by summarily denying her modification petition, by which she sought to have her daughters returned to her custody or to have reunification services reinstated.  She also contends the court erred by failing to find the beneficial parent/child relationship and beneficial sibling relationship exceptions to adoption applied to preclude termination of her parental rights to Rebecca.  Finally, she contends the court erred by terminating visitation with D.  We affirm the orders.

### *FACTUAL AND PROCEDURAL BACKGROUND*

In January 2010, D., who was then nine years old, was hospitalized under section 5150, after assaulting mother, Rebecca, and two other children in the home.  D. was diagnosed with acute posttraumatic stress disorder attributed to being exposed to a history of domestic violence between her parents.  In 2006, D.'s father, Daniel S. (father), was arrested and served a 360-day jail term after pleading guilty to spousal abuse.  During father's incarceration, mother and father divorced and mother obtained sole physical and legal custody of the children at that time.

Following D.'s hospitalization, mother requested assistance in placing D. based on her inability to protect Rebecca from D. or protect D. from herself.  The respondent Tulare County Health and Services Agency (agency) initiated dependency proceedings and placed D. in a therapeutic foster home.

In May 2010, the juvenile court took dependency jurisdiction over D. under section 300, subdivision (c) (serious emotional damage).  The court removed D. from parental custody, and granted the parents reunification services.  The court also ordered

---

[1]      All statutory references are to the Welfare and Institutions Code unless otherwise specified.

weekly supervised visits. The court removed D. from parental custody, and granted the parents reunification services. The court also ordered weekly supervised visits.

As of mid-November 2010, the parents had complied with court-ordered services and consistently visited with D. Agency and CASA (Court Appointed Special Advocates) reports both noted that D. experienced anxiety before visits with mother but not before visits with father. Despite her anxiety, however, D. also reported enjoying visits with mother.

In a report for the six-month review hearing, the social worker noted that during a recent visit with mother in late November 2010, D. became agitated and refused to return to her foster home, indicating she wanted to go home with mother. The social worker learned from several sources mother had been telling D. she would be going home. After speaking with mother, the social worker concluded that, for the past five months, mother had maintained a sincere belief D. would be going home once she stabilized. The social worker explained the outcome was unknown and mother appeared to understand.

At the six-month review hearing in early December 2010, the juvenile court ordered father to begin having some unsupervised visits with D. The court ordered supervised visits to continue with mother, finding there was evidence unsupervised visits would be detrimental to D. based on the child's anxiety and behavior, and mother's inability to follow the court's orders regarding discussing placement and return home with the child.

In early February 2011, the agency initiated dependency proceedings on behalf of Rebecca, who was then six years old. Among other things, the agency alleged Rebecca was at substantial risk of suffering from serious emotional damage due to mother's emotionally abusive behavior (§ 300, subd. (c)), which included manipulating Rebecca into making allegations of physical and sexual abuse against father and exposing her to age-inappropriate materials and pictures about abuse. Based on the dependency proceedings involving D., the agency also alleged that mother's emotional abuse of D.

3

engendered a similar risk of harm to Rebecca (§ 300, subd. (j)). At the detention hearing, the juvenile court ordered Rebecca to be placed with father and ordered therapeutic visitation with mother.

In a report for the 12-month review hearing in D.'s case, the social worker recommended terminating mother's reunification services. The social worker noted that, although mother had completed parent training and continued to attend therapy, she had not stabilized her living situation, personal life, or mental health. Instead of focusing on herself, mother appeared to have spent all her energy attempting to prove father was not a suitable parent.

Shortly after Rebecca's detention, mother called the social worker and said her house "burned to the ground." The social worker subsequently learned from a fire department investigator that the fire was confined to the master bedroom and, while mother claimed father started the fire, all the evidence pointed to mother having started the fire. Similarly, a police investigator reported he was 100 percent certain mother committed arson. The fire department investigator also reported a pet died in the fire and expressed concern that someone who would leave animals in the house to die would be a danger to herself and her children.

The social worker further reported that mother had subjected her daughters to inappropriate behavior and conversations. Mother made false reports that father molested Rebecca and coached Rebecca to tell her physician she was molested. Mother also subjected Rebecca to a "SART" examination at the hospital. Rebecca told her therapist that mother "showed her how to throw fits" and she was helping mother send father back to jail. The therapist felt Rebecca carried a lot of weight in having to take care of mother and mother was not capable of parenting. The social worker believed the therapist's assessment would also apply to D.

The social worker further reported that mother made inappropriate comments during visits with D. and engaged in conduct interfering with the foster parents' ability to

4

make day-to-day decisions regarding D.'s care. On several occasions, mother looked at D. at the beginning of the visit and stated, "You need your eyebrows waxed." The foster parents reported that mother had recently asked them to allow her to follow them to a salon and offered to pay for the hair removal. In the social worker's opinion, suggesting to a 10-year-old she needed her brows waxed in order to look acceptable was hurtful and did not promote the self-confidence others were trying to instill in her.

On another occasion, mother gave D. money with a list of specific instructions on what to do with the money. The foster parents reported the responsibility mother placed on D. for spending the money led to a major incident with D. running away from the foster home and the police being called.

Additionally, the social worker received ongoing complaints from the foster parents about mother making inappropriate statements during phone visits with D. For example, shortly after Rebecca's detention, mother told D. that Rebecca had been kidnapped and a bald man had been seen taking Rebecca from her school. D. was very distressed by this "news" about Rebecca. Although the foster parents monitored the phone visits, mother would usually blurt something out and it would be too late to intervene.

D. also made repeated statements about father wanting to kill mother that were clearly a repetition of mother's words.

In a report for the jurisdiction/disposition hearing in Rebecca's case, the social worker reported Rebecca was doing well in her placement with father and her negative behaviors had stabilized. The social worker also recommended that mother not be offered reunification services based on her failure to reunify with D.

At the 12-month review hearing in D.'s case, which occurred on April 12, 2011, the juvenile court terminated mother's reunification services. The court ordered weekly supervised visits with mother and unsupervised visits with father, including overnight visits at the agency's discretion.

5

In late April 2011, the juvenile court exercised its jurisdiction over Rebecca under section 300 subdivisions (c) and (j), and granted sole legal and physical custody of Rebecca to father. The court ordered monthly visits with mother were to continue in a therapeutic setting until the therapist determined visits could occur outside such setting.

In a report for the 18-month review hearing in D.'s case, the social worker recommended that D.'s visits with mother be changed from supervised to therapeutic visits. During visits with D., mother continued to overstep boundaries she knew were not acceptable. For example, she turned up the music so the case aide could not hear what she was saying to D. However, mother did comply when the case aide told her to turn the music down. Mother also questioned D. over and over again about how she was feeling, not stopping until D. gave her the response she wanted. The social worker thought mother was attempting to act as D.'s therapist during visits.

Regarding sibling visits, the social worker reported that D. had been having supervised visits with Rebecca every other week since May 2011. Although the children had some difficulty with sibling rivalry, many service providers remarked there was an obvious bond between them and the children expressed they liked spending time together at their visits.

At the 18-month review hearing in D.'s case on August 12, 2011, the juvenile court placed D. in father's custody and set a hearing on the agency's recommendation regarding visitation with mother. In an addendum report prepared for that hearing, the social worker reported that on July 5, 2011, following an incident in which D. and Rebecca ran away from father's house, mother called the social worker and claimed the investigating police officer told her the children said they ran away because father was hitting them and they were afraid of him. The same day, the officer told the social worker the children did not make the statements mother attributed to them. Instead, the children said mother told them to run away during D.'s supervised visit on Friday, July 1,

6

2011. When the officer asked D. if father was hurting her, she said no. The children did not appear to be afraid of father when they were dropped off at his house.

The social worker also described recent incidents in which mother flouted instructions regarding visitation, including not to bring presents or to talk about her recent loss of stillborn twins. As to the latter, the children's therapist had made it very clear to mother that talking about the loss of the twins would not be beneficial to either Rebecca or D. Nonetheless, mother engaged in behavior drawing attention to the loss, including exposing a tattoo on her back depicting two sets of baby feet, wearing a necklace with symbols representing four children, and including photos of the twins' funeral among photos of a grandparent's funeral D. had asked mother to bring to the visit.

Mother also continued to make inappropriate statements about the dependency proceedings. During a supervised visit on August 15, 2011, mother told D. she would not have visits anymore because of the upcoming court hearing and because it might conflict with her visits with Rebecca. The case aide said she would try to reschedule visits so mother could still visit D. Later during the same visit, when D. suggested she might be able to have overnight visits with mother, mother responded it would not be possible. D. then suggested mother might be able to come to her school. Mother replied, "That would never happen." When D. asked her mother why not, mother replied, "You made your choice." D. asked, "What?" Mother repeated, "You made your choice." Confused, D. asked her mother to explain how she had made a choice. The case aide intervened and told mother the conversation was inappropriate. A few minutes later, D. asked mother if she was okay. Mother stated she felt bad and guilty, she did not mean it, and it came out wrong. Mother also apologized to the case aide and claimed she meant to say "the decision has been made."

The social worker observed that, since D. had been receiving rehabilitation services in father's home, her behaviors had begun to improve. But D. continued to have difficulty managing her behaviors after visits with mother. Because of mother's ability to

7

twist words and actions to portray only good intentions, the social worker opined a trained therapist would be the best person to handle visits with mother.

At the hearing regarding visitation on August 23, 2011, the juvenile court found it was in D.'s best interests to have visits with mother occur only in a therapeutic setting. The court also reduced visits to twice a month.

On November 29, 2011, the agency filed a section 300 petition on Rebecca's behalf alleging father's physical abuse placed the child at a substantial risk of suffering serious physical harm (§ 300, subd. (a)). The same day, the agency filed a supplemental petition (§ 387) on D.'s behalf. According to the petition, on August 12, 2011, the juvenile court returned D. to father's custody under court-supervised family maintenance and ordered there was to be no corporal punishment used on the child. This placement disposition had been ineffective in protecting D. due to father's anger management issues and incidents of physical violence against D. Since D.'s return to father's custody, there had been four agency referrals for physical abuse by father, one of them substantiated.

At the detention hearing in early December 2011, D. and Rebecca were placed together in a foster home and father was ordered supervised visits twice a week.

In an addendum report submitted in January 2012, the social worker reported that mother continued to be manipulative and was now contacting D. through letters. After assuming the therapist was helping D. review the letters in therapy, the social worker learned the therapist had not been reading the letters. The social worker also learned that mother contacted D.'s principal and teacher on a weekly basis and communicated with D. through these professionals, even though the school had been sent the court's orders regarding mother's contact with D.

The social worker observed that both mother and father continued to act without the children's best interests at heart. They disobeyed court orders and failed to accept responsibility for their actions, instead blaming others involved in the case. It was

8

evident the children had suffered as a result of their parents' bitter custody battle and inability to parent appropriately.

The social worker added that D. and Rebecca had become very close over the past six months and it would be detrimental to both of them to be separated at that time.

In an addendum report submitted in early March 2012, the social worker reported that, on January 17, 2012, after Rebecca disclosed she had been sexually abused by D., the agency instructed the foster parents to separate the children and alarms were installed on their bedroom doors. On January 28, 2012, D. attempted to make a sexual advance towards another foster child. The agency placed D. and Rebecca in separate licensed foster homes and implemented a safety plan to assure other foster children were protected from D.'s sexualized behavior.

The social worker further reported that father made statements indicating he had been aware of a number of incidents of sexualized behavior between D. and Rebecca occurring between April 2011 and November 2011. When asked why he failed to report these incidents to the children's therapists or social workers, he responded he did not think it was necessary and he felt "uncomfortable" addressing the behavior with the children.

Following the contested jurisdiction hearing, which took place in late January 2012, the juvenile court issued a written ruling on March 14, 2012, sustaining allegations against father in amended section 300 and section 387 petitions, as well as in a subsequent petition (§ 342), the agency filed on behalf of the children. In so ruling, the court found the following two incidents of physical abuse occurred: "On or about November 14, 2011, while Rebecca was in the shower, [father], as a form of punishment, struck Rebecca in the face and hip with his hand" and "On or about October 13, 2011, [father] engaged in a physical altercation with [D.]. During the physical altercation [D.]'s face was injured." The court also found that father neglected D.'s medical needs by failing to ensure she regularly received all doses of her psychotropic medication.

9

In early April 2012, mother filed her first section 388 petition for modification, seeking to have Rebecca returned to her care and reunification services reinstated as to D. As changed circumstances, the petition alleged: "Both children were removed from their father's care and remain in foster care. I have continued to attend and participate in therapeutic visitation with my children and attend counseling." In an attachment to the petition, mother asserted, among other things, that the allegations of physical abuse involving father recently found true by the juvenile court were "the same allegations that the mother was accused of making up and was used as a denial of continued services as to [D.] … and as a basis for removal of Rebecca."

At the disposition hearing in May 2012, the juvenile court ordered Rebecca and D. removed from father's custody based on the facts of the sustained petitions. The court also denied mother's section 388 petition, finding there had been no change of circumstances, and even if there had been a change of circumstances, mother had not shown it was in the children's best interests that they be returned to her custody or for reunification services to be reopened.

The juvenile court further found both parents were out of time for reunification services as to D., and denied reunification services as to Rebecca based on their failure to reunify with D. The court suspended mother's rights to make any medical, dental, mental health, and educational decisions for the children. The court ordered weekly supervised visits with father, twice monthly supervised visits with mother, and set a section 366.26 hearing.

In a report on Rebecca for the section 366.26 hearing, the social worker recommended the juvenile court find Rebecca adoptable and terminate parental rights. The social worker noted that, since visits with mother had changed from a therapeutic to a supervised setting, visits had been a better experience for the children. They were happy to see mother and interacted appropriately with her. Rebecca was very easy going and carefree, while D. was much more emotional and quick to become upset and

10

withdrawn. At the end of a recent visit, Rebecca gave mother a hug and kiss but did not show any signs of being sad it was time to say goodbye. The children ran to meet their foster mothers. Rebecca said, "Hi mommy!" and gave her foster mother a hug when she saw her.

The social worker concluded that, while Rebecca appeared to enjoy visits with her parents, there did not seem to be any benefit to her in having the visits continue. Rebecca had adjusted to the idea she would be living permanently with her foster parents and understood parental visits were coming to an end. She did not ask to see her parents, did not look forward to visits with them, or show distress when the visits ended. The social worker also noted a trend in that the visits would bring up a lot of negative memories for Rebecca regarding things that had happened in the past. Her foster parents would listen to her and help her process those thoughts and memories. The social worker noted that Rebecca's primary attachment was to her foster parents. Rebecca referred to them as mom and dad, and viewed their daughters as her sisters.

Regarding sibling visitation, the social worker reported that Rebecca enjoyed visiting with D., but visits could also be stressful for her because of D.'s behavior. When they spent significant periods of time together, there tended to be conflict. During a week in August 2012, the children spent almost every day together. By the end of the week, Rebecca had become very stressed due to the frequent conflict with D. The foster parents reported that on the Saturday night after the week spent with D., Rebecca had a major tantrum when she was told it was time to clean up an art project she was working on. She started screaming and ripping the paper. This type of behavior was very uncharacteristic for Rebecca, and it appeared the stress of the week spent with D. was the cause of Rebecca's outburst. The social worker recommended that sibling visits be closely monitored by their foster parents, and if Rebecca continued to have similar reactions after prolonged visits with D., the visits be reduced to no more than once a week.

A CASA report for the section 366.26 hearing noted that mother continued to bring gifts to the visits without approval. Most recently mother had brought school supplies for the children but was not allowed to bring them into the visit. Mother also continually sent emails to the foster parents about various topics and with various requests. She recently sent news of her engagement and future wedding, and asked the foster parents to communicate the news to the children. When her request was denied, mother responded that she would not lie to the children if it came up and she would tell them the news. Mother sent another email asking the foster mothers to attend a group counseling session with mother's therapist of 10 years in order to "set boundaries" until the children turned 18 and were returned to her.

The CASA report also described a recent visit in which mother reportedly noticed "sores" all over Rebecca's body and exclaimed that Rebecca had to be taken to the doctor immediately to have them treated. When the visit ended, Rebecca was convinced she had sores on her arms and legs and wanted to be taken to the doctor right away. Neither the worker who supervised the visit nor the foster mother could see or find any kind of sore or mark on Rebecca's skin. However, Rebecca was taken to the doctor's office. There, the doctor found no evidence of sores and expressed no concern about Rebecca's health.

According to the CASA report, both sets of foster parents continued to express concern about the negative impact visits with mother was having on the children and their ability to maintain stability in their foster homes. D.'s foster parents reported D. continued, although less frequently, to have behavioral issues when returning from visits with mother. After visits, she seemed to be more emotionally unstable and was often unable to follow rules already set and established in the foster home. When she was disciplined, her behavior could turn into a full blown "tantrum." Similarly, Rebecca's foster parents reported she had some behavioral issues after her visits with mother. She would often become reserved and distant or very hyperactive. She would also exhibit some anxiety for a few days.

12

Concerning the relationship between D. and Rebecca, the CASA report noted that, although they were placed in separate foster homes, both foster families had an established relationship with the children and with each other and this helped increase the amount of time the children were able to spend with each other outside of scheduled visits. Both D. and Rebecca expressed a desire to continue spending time with each other and with each other's foster families. The children were also together during visits with mother, and there had not been any issues with their interaction at these visits.

In a report on D. for the section 336.26 hearing, the social worker recommended that a legal guardianship be established for D. with her current care providers and her dependency be dismissed. The social worker reported that mother's mental health instability and manipulative and controlling behavior continued to cause D. to be stressed and confused about reality. During a visit in late July 2011, which the social worker supervised, D. constantly sought mother's approval. When mother's attention was on Rebecca, D. became upset towards both of them. D. would either become withdrawn or engage in behaviors such as whining, kicking, and crying. When visits with mother ended, D. was eager to return to the foster parents and did not cry when they departed from the visit.

The foster parents reported that D. continued to have emotional breakdowns attributed to visits with mother. Any topic relating to mother usually escalated into a tantrum, during which D. would scream, kick, and bite the foster parents. On one occasion, when the foster parents attempted to schedule events for the summer, D. became angry because, according to her, mother had already planned her summer during a visit. D. told her foster parents, "My mom said I have to do these events." The social worker opined that D.'s apparent belief that mother still had some level of control in her life was unhealthy and jeopardized her well-being. D.'s need to be accepted by mother appeared to be a stressor leading to behavioral issues in the foster home.

D.'s therapist reported the child had been diagnosed with reactive attention disorder (RAD), a mental disorder characterized by a failure to form a normal attachment with the primary caregiver in early childhood. By definition, RAD "is associated with grossly pathological care that may take the form of persistent disregard of the child's basi[c] emotional needs." The social worker observed that, since D.'s birth, her parents had maintained a dysfunctional and hostile relationship, adding to D.'s mental health instability. Visits with her parents appeared to have a negative influence on D.'s behavior due to her failure to establish a healthy attachment with them.

With respect to sibling visitation, the social worker noted that D. and Rebecca were unable to visit for long periods of time as it led to arguments. At times, D. exhibited overwhelming, controlling behavior towards Rebecca. D. appeared to resent Rebecca because she was a resilient child who rarely got in trouble, while D. was often viewed as the "troubled child." For this reason, D. felt animosity towards Rebecca and would immediately become upset if a parent paid more attention to Rebecca. D.'s negative behavior also appeared to have a negative influence on Rebecca's behavior in that she tended to mimic D.'s aggressive behavior. The social worker recommended reducing sibling visits to once a month.

On August 27, 2012, mother filed a second section 388 petition for modification requesting the juvenile court to return D. and Rebecca to her custody or to reinstate reunification services. Mother also requested the court to reinstate her medical, educational, and mental health rights, and to consider relative placement if the court did not agree with returning the children to her custody. As changed circumstances, the petition alleged: "Both children were removed from their father's care and remain in non-relative placement. I have continued to attend and participate in visitation with my children and additional services, described in the attached declaration."

In addition to the changed circumstances alleged in the section 388 petition, mother's supporting declaration asserted further changed circumstances included that she

14

was getting married in September 2012, and had the support of her fiancé, family and friends; she resided in a large four-bedroom home with plans to purchase; she completed her graduate education; she had a part-time job affording a flexible schedule; and she had been hired by two companies for contract work to begin with the commencement of the school year. Mother declined to identify the companies that had hired her, asserting: "I am afraid to indicate where I have been hired as the Agency … has told me a number of places that 'you cannot work because it would be a conflict of interest.' I am afraid that if I disclose this information, another restriction, by the Agency, will be imposed on me."

In her declaration, mother leveled numerous complaints against the agency regarding its handling of the dependency proceedings. For example, mother asserted:

> "The Agency has a history of making hasty and poor decisions in regards to this case, shutting me out at any opportunity, and not seeking what a multitude of Professionals contributed as to the best interests of the girls, which was the fostering of an ongoing bond and relationship with me. The Agency has been very selective only allowing their opinion or the selected opinions that align theirs into the records the Court have for review and fully omitted or incorrectly reported what the Therapists had reported to the Agency.… [¶]

> "… In this case, time and time again, the Agency has worked to build a case against any reason to provide me services while bending over backwards to support the Father in his reunification efforts. While it is not meant to be comparative, I have no criminal history; I work in Education; and I have previously worked for 10 years in Social Work, and yet not even similar opportunities were afforded me. I have been the one who has been responsible for primary parenting responsibilities and daily care needs, in addition to their emotional and spiritual needs being met, not the Father. The Agency does not seem to weight any significance as to the history of the bond between these children and myself nor to the Professionals opinions that have been afforded the Agency. Not allowing me the opportunity of reunification services is simply not in the best interest of the girls and, in fact has already proven detriment[al] to them and will continue to prove detrimental."

Mother repeatedly referred to the agency as having a "personal agenda to alienate the children from their parents a biological family." She also criticized others involved in the

15

dependency proceedings including father, father's attorney, social workers, and foster parents.

On August 29, 2012, the agency filed an addendum report addressing the sibling relationship. The social worker noted that, since late January 2012, the children had been living in different homes after they were separated because D. was acting out in a sexualized manner towards Rebecca. After the children were separated, Rebecca continued to thrive. She did not suffer any hardship or anxiety from being separated from D. She was able to settle in with her current foster home and create an identity with her new foster sisters and foster parents. Rebecca did not request more frequent contact with D. and did not ask to be placed back together with her. Frequent contact with D. could be very stressful for her. The addendum report concluded that, although Rebecca enjoyed visiting with D., it would not be detrimental to Rebecca if visitation came to an end. Because the children were placed with family friends, continued contact between them was likely. However, if that contact were to be severed, Rebecca would continue to be happy and successful in her home and other areas of life.

On August 30, 2012, the agency submitted an addendum report responding to mother's section 388 petition. In the report, the social worker recommended denying the petition, observing: "In the mother's twenty-five page report named *Declaration and Argument of Mother*, dated July 29, 2012, she presented information that is evidence in and of itself that the mother has not changed. Her declaration is old or is already before the court." The social worker continued: "The same reasons and concerns why the court denied Reunification Services on 04/29/2011 and 05/10/2012 remain of concern today."

The social worker observed that, despite mother's participation in numerous intervention programs, which mother listed in her declaration, those services had been ineffective in addressing her mental health issues. Mother continued to engage in controlling and manipulative behavior towards the children to the detriment of their well-being. The social worker referred to recent examples, including the visit where mother

16

convinced Rebecca she needed medical care for sores on her body. In another visit, mother questioned Rebecca why she was dirty. Rebecca explained her feet were dirty because she had just returned from "playing outside." Mother subsequently filed a claim against the foster parents, alleging the foster home was filthy and Rebecca did not shower. The allegation was investigated and determined to be unfounded.[2]

The social worker noted mother's behavior reflected a consistent pattern of manipulating the children's behavior by making them believe a false claim. Mother also had a long history of fabricating false allegations against people who posed a threat to her, and it appeared she was now using her visitation time to obtain information from the children in hopes of making such claims.

Finally, the social worker observed that mother had failed to take responsibility for her role in the children's abuse and failed to understand the reasons why the court terminated reunification services. When the social worker spoke with mother in late May 2012, he specifically asked if she understood why the children could not be returned to her care. She failed to answer the question. Instead she blamed father for his role in domestic violence. When the social worker repeated the question, mother again avoided the question and failed to accept responsibility for her role in the abuse.

On October 22, 2012, the juvenile court summarily denied mother's section 388 petition, stating: "I don't find that there's sufficient change of circumstances to warrant a 388 hearing at this time." The court then proceeded to the section 366.26 hearing and heard the parents' testimony.

Mother testified she had ongoing contact with D. since the child was removed from her care. Until May 2012, mother participated in all of D.'s educational, medical,

_____

[2]      Mother repeated this allegation against the foster parents in the declaration she submitted in support of her section 388 petition. Mother claimed Rebecca had arrived at the last couple of visits "with medical needs not met and her hygiene being extremely poor" and that Rebecca had made the following statement: "I am filthy dirty. I don't remember when I took a shower but it was last week some time… Tonight I am going to ask permission to take a bath or a shower." Mother complained the agency failed to address the concerns raised by Rebecca's appearance and statement.

mental health, dental, and vision services. Prior to D.'s placement in foster care, the children lived together with mother and continuously participated in family activities. They went to church every week, took family vacations together, and celebrated their birthdays with other family members. The children were also enrolled in activities including soccer, basketball, and cheerleading.

Mother testified that, at the beginning of visits, D. and Rebecca would run right up to her and call her "Momma." They expressed affection towards her continually throughout the visits. They would kiss her, play with her hair, and say, "I love you Mommy, I miss you Mommy." Rebecca would specifically ask about mother's fiancé, asking whether he missed and loved her, and would ask mother to tell him she missed and loved him.

Usually at the end of visits, Rebecca would ask mother to carry her and D. would hold mother's hand while mother walked them out. According to mother, this stopped during the second visit in July 2012, when mother "was no longer allowed to hug them or walk them out." The children always asked mother to walk out with them and could not understand why mother was unable to walk them to the door.

Regarding the visit in which mother reportedly told Rebecca she had sores or spots on her, mother testified: "She told me. I did not tell her." Mother claimed that both she and the social worker present saw some sores or spots on Rebecca.

Mother further testified that during visits, the children interacted with each other most of the time and expressed affection towards each other. According to mother, this expression of affection was "typical for them" and they had "a real good, sharing relationship."

Father testified he loved his daughters, but he thought it was in their best interests to be placed with their current foster families. He did, however, oppose the recommendation to terminate his visits with D. During visits, the children were affectionate towards him and D. did not have tantrums. In father's opinion, D.'s

18

emotional and mental health had improved dramatically since her placement with her current care providers. He was now able to sit down and talk to her like an adult. But he also thought she was susceptible to falling back into old patterns.

After considering the evidence and arguments of counsel, the juvenile court adopted the agency's findings and recommendations, which included terminating parental rights to Rebecca, ordering a legal guardianship for D., and dismissing D.'s dependency. The court further found that parental visitation "would be detrimental and not in the best interest of the child [D.]," and ordered the parents were to have no visitation, telephone contact, or other communication with D. In regard to its orders in D.'s case, the court observed:

> "[S]he's doing much better in her current placement and I believe the stability is absolutely necessary for her success in life. Based on the mental health findings, it does not seem appropriate to place her in a precarious situation where she's torn between her parents and her legal guardians."

## DISCUSSION

### I.    *Denial of section 388 petition*

Mother contends the juvenile court abused its discretion by summarily denying her second section 388 petition for modification seeking to have D. and Rebecca placed with her or for reunification services to be reinstated. Mother asserts she made a prima facie showing her circumstances had changed and that the proposed modifications were in the children's best interests.

#### A.    *Applicable legal principles*

Section 388 allows a parent of a dependent child to petition the juvenile court to change, modify, or set aside any previous order of the juvenile court. When it appears from the petition that the best interests of the child "may" be promoted by the proposed modifications, the court "shall" order a hearing on the petition. (§ 388, subd. (d); see *In re Marilyn H.* (1993) 5 Cal.4th 295, 309–310 (*Marilyn H.*) ["[t]he parent need only make a prima facie showing to trigger the right to proceed by way of a full hearing"].) The

court may summarily deny a section 388 petition without a hearing, however, if the petition fails to make the required prima facie showing. (Cal. Rules of Court, rule 5.570(d); *In re Anthony W.* (2001) 87 Cal.App.4th 246, 250 (*Anthony W.*).) "'There are two parts to the prima facie showing: The parent must demonstrate (1) a genuine change of circumstances or new evidence, and that (2) revoking the previous order would be in the best interests of the children.…' [Citation.]" (*In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1079.)

A section 388 petition must be liberally construed in favor of its prima facie sufficiency (Cal. Rules of Court, rule 5.570(a); *Marilyn H.*, *supra*, 5 Cal.4th at p. 309), but conclusory allegations in a petition or its supporting declarations, without supporting evidence, are insufficient to make the required prima face showing (*Anthony W.*, *supra*, 87 Cal.App.4th at pp. 250–251). "A 'prima facie' showing refers to those facts which will sustain a favorable decision if the evidence submitted in support of the allegations … is credited. [Citation.]" (*In re Edward H.* (1996) 43 Cal.App.4th 584, 593.) "Successful petitions have included declarations or other attachments which demonstrate the showing the petitioner will make at a hearing .…" (*Anthony W.*, *supra*, at p. 250.) Indeed, "[i]f a petitioner could get by with general, conclusory allegations, there would be no need for an initial determination by the juvenile court about whether an evidentiary hearing was warranted. In such circumstances, the decision to grant a hearing on a section 388 petition would be nothing more than a pointless formality." (*In re Edward H.*, *supra*, at p. 593.)

We review a juvenile court's summary denial of a section 388 petition for abuse of discretion. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 460.) If the petition fails to make the required prima facie showing, summary denial of the petition without a hearing does not violate the petitioner's due process rights. (*Id.* at pp. 460–461.)

Furthermore, when a section 388 petition is filed *after* the parents' reunification services have been terminated, in assessing whether the petition has made the required

prima facie showing, the court must be mindful that "the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation] ...." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).)

### B.    Analysis

Having reviewed mother's arguments on appeal, and her section 388 petition, we are not persuaded the juvenile court abused its discretion in summarily denying the petition without a hearing. Mother failed to make a prima facie showing there had been a genuine change of circumstances undermining the substance of the court's prior orders. Reunification services were terminated in D.'s case and denied in Rebecca's case based on evidence that, despite her ongoing participation in counseling and other services, mother continued to engage in inappropriate behaviors during visits with the children. The destabilizing effect mother's behaviors had on the children was well documented throughout the dependency proceedings. However, mother's petition failed to take any responsibility for these behaviors, let alone show she had made any changes ameliorating them. Instead, she portrayed herself as a victim who always tried to do what was best for her children, not recognizing her own role in the children's dependencies.[3] Mother's declaration thus reflected a persistent lack of insight into her emotionally harmful behaviors and failed to show she had made any meaningful progress that would justify modifying the court's prior orders.

Moreover, all but two of the numerous attachments to mother's petition—i.e. declarations supporting mother, therapist and psychologist reports, and family law documents—existed at the time she filed her first section 388 petition in April 2012, and therefore did not constitute new evidence or changed circumstances in support of her August 2012 petition at issue here. The two most recent documents were emails written

---

[3]    For example, at one point she declares: "I do take responsibility in so much I have attempted to be an advocate and protect my children, in the coming out of a highly volatile marriage that ended in a highly volatile fashion."

21

by relatives of mother expressing an interest in having the children placed with them. However, mother presented no evidence showing that removing the children from their current stable placements and placing them with either their aunt in Cheyenne, Wyoming or great uncle in Sacramento would be in the children's best interests. Given mother's failure to meet the threshold requirements for a hearing on her section 388 petition for modification, we find no abuse of discretion in the juvenile court's summary denial of the petition.

## II.    *Beneficial parent/child relationship*

At the section 366.26 hearing, mother's attorney argued that termination of parental rights would be detrimental to Rebecca based on the strong relationships she had with mother and D.  On appeal, mother contends the juvenile court erred by failing to apply the beneficial parent/child relationship exception to preclude termination of her parental rights.  Mother asserts she regularly visited and occupied a parental role towards Rebecca, who had a loving, positive, beneficial relationship with her.  She further asserts Rebecca would suffer detriment if parental rights were terminated.

### A.    *Applicable legal principles*

The purpose of a section 366.26 hearing is to select and implement a permanent plan for the dependent child.  (*In re S.B.* (2009) 46 Cal.4th 529, 532.)  The Legislature's preferred permanent plan is adoption.  (*In re D.M.* (2012) 205 Cal.App.4th 283, 290.) "At a section 366.26 hearing, the court must terminate parental rights and free the child for adoption if [1] it determines by clear and convincing evidence the child is adoptable within a reasonable time, and [2] the parents have not shown that termination of parental rights would be detrimental to the child under any of the statutory exceptions to adoption found in section 366.26, subdivision (c)(1)(B)(i) through (vi).  [Citation.]" (*Id.* at p. 290.) In this case, mother does not dispute that Rebecca is adoptable; she contends the parent/child relationship exception applies.  (§ 366.26, subd. (c)(1)(B)(i).)

22

To avoid termination of parental rights under the parent/child relationship exception, the juvenile court must find "a compelling reason for determining that termination would be detrimental to the child" due to the circumstance that "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) It is the parent's burden to prove the exception applies. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 574 (*Autumn H.*).)

The Court of Appeal in *Autumn H.* defined a beneficial parent/child relationship as one that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H., supra,* 27 Cal.4th at p. 575.) "[T]he court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*)

A parent must show more than frequent and loving contact or pleasant visits for the exception to apply. (*In re C.F.* (2011) 193 Cal.App.4th 549, 555; *In re C.B.* (2010) 190 Cal.App.4th 102, 126; *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527 (*I.W.*).) "The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent. [Citations.] Further, to establish the section 366.26, subdivision (c)(1)(B)(i) exception the parent must show the child would suffer detriment if his or her relationship with the parent were terminated. [Citation.]" (*In re C.F., supra,* at p. 555.)

There is a split of authority concerning the standard of review in this context. (See *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1315 (*Bailey J.*) and *In re K.P.* (2012) 203 Cal.App.4th 614, 621–622 [hybrid combination of substantial evidence and abuse of

23

discretion standards; applying substantial evidence test to determination of the existence of a beneficial sibling relationship and the abuse of discretion test to issue of whether that relationship constitutes a compelling reason for determining that termination would be detrimental to the child]; *Autumn H.*, *supra*, 27 Cal.App.4th at p. 576 [substantial evidence test—"On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order."]; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 (*Jasmine D.*) [abuse of discretion test].)

Our conclusion in this case would be the same under any of these tests because the practical differences between the standards are "not significant," as they all give deference to the juvenile court's judgment. (See *Jasmine D., supra,* 78 Cal.App.4th at p. 1351.) "'[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling.... Broad deference must be shown to the trial judge. The reviewing court should interfere only "'if [it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he [or she] did.' ... "'" [Citation.]" (*Ibid.*) Moreover, a substantial evidence challenge to the juvenile court's failure to find a beneficial relationship cannot succeed unless the undisputed facts establish the existence of a beneficial parental relationship, since such a challenge amounts to a contention that the "undisputed facts lead to only one conclusion." (*I.W.*, *supra*, 180 Cal.App.4th at p. 1529; *Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314.)

### B.    Analysis

In this case, it is undisputed mother maintained regular visitation and contact with Rebecca. Mother, however, did not meet her burden of proving that Rebecca would benefit from continuing her relationship with her, as she had not shown that relationship

promoted Rebecca's well-being to such a degree that it outweighed the well-being she would gain in a permanent home with new adoptive parents.

The evidence showed Rebecca was bonded to mother and enjoyed visits with her. But visits also had a negative effect on her. Rebecca's anxiety increased and her behavior worsened after visits with mother. Mother also continued to engage in controlling and manipulative behaviors. The CASA report prepared for the section 366.26 hearing described a recent visit in which mother convinced Rebecca she needed immediate medical attention for nonexistent sores on her body.[4] In another visit, after questioning Rebecca about being dirty, mother filed an unfounded complaint again the foster parents claiming their home was filthy and they were not allowing Rebecca to shower. These interactions suggest mother misused the visits and her ability to influence Rebecca to raise false doubts regarding the quality of care Rebecca was receiving from her foster family. Thus, the evidence indicated Rebecca's attachment to mother was a troubled and not a positive one.

In contrast, there was evidence showing Rebecca was thriving in her placement with her prospective adoptive parents. She was strongly bonded to them, referring to them as mom and dad, and she viewed their daughters as her sisters. Moreover, Rebecca did not ask to see her parents or show any distress when parental visits ended. Given the emotional problems Rebecca was having following visits with mother and the stability she experienced while in her foster family's care, the juvenile court reasonably could find Rebecca's need for permanence outweighed the benefits she would derive from a continued relationship with mother. It also could find that severing Rebecca's relationship with mother would not deprive her of a substantial, positive emotional attachment that would greatly harm her.

---

**4** Although mother disputed CASA's and the agency's version of the incident, the juvenile court was free to discount her testimony as self-serving and deserving of little weight.

### III. Beneficial sibling relationship exception

Next, mother contends the juvenile court erred in failing to apply the beneficial sibling relationship exception to termination of parental rights. She asserts Rebecca and D., who had spent most of their lives together, shared a strong sibling bond, and ongoing contact between them was in Rebecca's best interests.

#### A. Applicable legal principles

The sibling relationship exception to terminating parental rights applies when the juvenile court finds there is a compelling reason for determining termination would be detrimental to the child because it would substantially interfere with that child's sibling relationship. (§ 366.26, subd. (c)(1)(B)(v).) Factors to be considered include the nature and extent of the relationship, whether the child was raised with a sibling in the same home and whether the child has a strong bond with a sibling. The court must also consider whether ongoing contact is in the child's best interests, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption. (*Ibid.*) The purpose of this exception is to preserve long-standing sibling relationships that "serve as anchors for dependent children whose lives are in turmoil." (*In re Erik P.* (2002) 104 Cal.App.4th 395, 404.)

"The sibling relationship exception contains strong language creating a heavy burden for the party opposing adoption." (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813.) Similar to the beneficial parent/child relationship exception of section 366.26, subdivision (c)(1)(B)(i), application of the sibling relationship exception requires a balancing of interests. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 951.) The parent must first show (1) the existence of a significant sibling relationship; (2) terminating parental rights would substantially interfere with that relationship; and (3) it would be detrimental to the child if the relationship ended. (*Id.* at p. 952.) After the parent shows a sibling relationship is so strong that its severance would be detrimental to the adoptive child, the court then decides whether the benefit to the child of continuing the sibling relationship

outweighs the benefits of adoption. (*Id.* at pp. 952–953; *In re Naomi P.* (2005) 132 Cal.App.4th 808, 823.)

### B. Analysis

Rebecca may have had a bond with D., shared a home with her, and had common experiences with her. To establish the sibling relationship exception, however, mother was required to establish severing the sibling relationship would cause Rebecca detriment. Here, there is no evidence that Rebecca would suffer detriment if her relationship with D. were severed. The children were separated in January 2012, after Rebecca disclosed she had been sexually abused by D. After they were placed in separate foster homes, Rebecca continued to thrive. She did not suffer any anxiety from being separated from D. or request to have more frequent contact with her. Indeed, multiple reports reflected that visits with D. were stressful and anxiety-provoking for Rebecca and had adverse effects on her behavior. Given evidence of the negative effect sibling visits had on Rebecca and Rebecca's need for stability and permanence, we cannot conclude that the juvenile court erred in failing to apply the beneficial sibling relationship exception to termination of parental rights.

## IV. Termination of visitation

Finally, mother contends the juvenile court's blanket no-contact and no-visitation order as to D. was an abuse of discretion because the evidence did "not support the court's finding that even limited visitation would be detrimental to the child." Mother acknowledges D. had "a conflicted relationship" with her, and that "the evidence supports a finding of some detriment from certain aspects of their contacts." But mother argues it was unfair to D. for the court to cut off all contact because the evidence showed continuing a relationship with mother was important to D. Mother asserts D. was consistently happy to see her, was affectionate towards and sought comfort from her, and, more than once, asked to live with or have more visitation with her.

### A. Applicable legal principles

Prior to permanency planning, during reunification efforts, visitation generally must be as frequent as possible, consistent with the well-being of the dependent child. (§ 362.1, subd. (a)(1)(A).) When reunification services are terminated and a permanency planning hearing set, the court must continue to permit the parent to visit the child pending the hearing unless it finds visitation would be detrimental to the child. (§ 366.21, subd. (h).) Moreover, where the juvenile court has selected a permanent plan of either guardianship or long-term foster care for the dependent child, it must order visitation with the parent unless the court finds by a preponderance of the evidence that visitation would be detrimental to the child. (§ 366.26, subd. (c)(4)(C); Cal. Rules of Court, rule 5.725(d)(7)(E); *In re Randalynne G.* (2002) 97 Cal.App.4th 1156, 1163.) Consequently, upon a finding of detriment, the juvenile court is empowered to terminate visitation between a parent and child.

The power to regulate visitation between parents and dependent minors rests with the court. (*In re S.H.* (2011) 197 Cal.App.4th 1542, 1557–1558.) The juvenile court has great discretion in deciding visitation issues and we will not disturb the juvenile court's decision absent an abuse of discretion. (*Stephanie M., supra,* 7 Cal.4th at p. 318.)

### B. Analysis

Mother's argument on appeal minimizes the troubled nature of her relationship with D. As in the case of her sister Rebecca, the record is replete with evidence that visits with mother had a destabilizing effect on D. Despite prior attempts by the juvenile court to minimize this effect, including by decreasing the frequency of visitation and ordering visitation in a therapeutic setting, mother continued to engage in inappropriate behavior, exploiting D.'s psychological fragility and need for mother's approval. There was evidence this behavior created unnecessary divisions between D. and her foster parents, who by all accounts, had provided D. with a high degree of stability hitherto missing in her life.

D. was always eager to return to her foster parents and did not cry when visits with mother ended.  At the same time, following visits with mother, D. would exhibit severe temper tantrums and difficulty following established house rules.  In light of evidence that visits with mother triggered D.'s emotional problems, as well as evidence of mother's ongoing inability to conform her own behavior to appropriate standards, the juvenile court did not abuse its discretion in finding visitation with mother would be detrimental to D. or by terminating all contact between them.

## *DISPOSITION*

The juvenile court's orders issued on October 22, 2012, are affirmed.


_____
HILL, P. J.

WE CONCUR:


_____
WISEMAN, J.


_____
LEVY, J.

29